UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| CHESAPEAKE EXPLORATION, L.L.C., § | | |
| *Plaintiff*, § | | |
| § | | |
| v. § | | |
| § | | |
| VALENCE OPERATING COMPANY, § | | |
| *Defendant/Third-Party Plaintiff*, § | | CIVIL ACTION H-07-2565 |
| § | | |
| v. § | | |
| § | | |
| CONOCOPHILLIPS COMPANY, § | | |
| *Third-Party Defendant.* § | | |

**MEMORANDUM OPINION AND ORDER**

Pending before the court are Chesapeake Exploration, L.L.C. and ConocoPhillips Company's motions for summary judgment. Dkts. 36, 43. As a threshold matter and for the reasons set forth below, the parties are REALIGNED so that Chesapeake remains the plaintiff in this action, but ConocoPhillips becomes the defendant. And upon consideration of the motions, the responses, the summary judgment record, and the applicable law, Chesapeake's motion is GRANTED and ConocoPhillips's motion is DENIED.

**I.   BACKGROUND**

On October 15, 1975, a predecessor in interest to third-party defendant ConocoPhillips ("CP") signed a Joint Operating Agreement ("1975 JOA") covering depths below 8,915 feet for over 7,000 acres in Victoria County, Texas. Dkt. 33, Ex. 4. The Assignment and Bill of Sale was not recorded in the Deed Records of Victoria County, Texas. The plat attached to the 1975 JOA

designated the properties subject to the agreement, including the property at issue—Section 10, Indianola R.R. Co. Survey A-440[1] ("A-440").

On December 27, 1991, CP conveyed a series of properties to Valence via an Assignment and Bill of Sale ("1991 Assignment"). Dkt. 33, Ex. 3. Valence contends that those properties included CP's interest in A-440.

On October 1, 2005, CP leased several properties, including A-440, to plaintiff Chesapeake Exploration, L.L.C ("Chesapeake") under a Paid-Up Oil and Gas Lease ("Chesapeake Lease"). Dkt. 33, Ex. 1. The lease had a primary term of 1 year with a standard habendum clause including an operations requirement that read "this lease shall be valid for a term of one (1) year from this date (called "primary term") and as long as thereafter as oil or gas is produced in paying quantities from the leased premises." *Id.* Then on August 22, 2006, CP and Chesapeake executed an Extension of Paid Up Oil & Gas Lease extending the primary term of the lease through October 1, 2007. Dkt. 33, Ex. 2.

On December 21, 2006, Roy Horne, a landman for Valence, wrote a letter to his counterpart, Kent Crawford, at CP. Dkt. 33, Ex. 6. The import of the letter was to inform CP that pursuant to the 1991 Assignment, Valence had acquired all of CP's ownership interest in A-440. Therefore, Valence stated that the Chesapeake Lease was a cloud on Valence's title to A-440. Valence demanded the following curative actions from CP (1) a Memorandum of Understanding stating that A-440 was subject to the 1975 JOA, and that CP's ownership interests to all properties included in the 1975 JOA had been sold to Valence; (2) production of all documents reflecting a different opinion; and (3) notice to Chesapeake of the cloud on its title under the Chesapeake Lease.

---

[1] The land is also called "Stayton Survey A-440" in the correspondence among the parties.

2

On May 4, 2007, Kent Crawford, CP's landman, replied to Valence and copied Chesapeake. Dkt. 33, Ex. 7. He stated that the Chesapeake Lease "would be effective only as to those rights/depths within the Stayton Survey A-440 that were not assigned to Valence Operating Company by Conoco, Inc by" the 1991 Assignment. *Id.* Since the JOA only covered depths from 8,915 downward—the base of the Upper Wilcox "E" sand—Crawford further stated that "the Chesapeake lease would be effective as to rights from the surface down to . . . 8915 feet." *Id.*

Unsurprisingly, Chesapeake took issue with CP's letter (and therefore Valence's letter) and responded with a letter from Ronnie Brown, Chesapeake's landman. Dkt. 33, Ex. 8. Chesapeake wrote that (1) under the terms of the Chesapeake Lease, there were no depth or mineral reservations, and (2) the 1991 Assignment transferred only properties in the E. L. McCollum Gas Unit of which A-440 was not a part. *Id.* Therefore, Chesapeake continued

> there is no documentation we have found to substantiate your opinion in [your] letter to Valence . . . . Therefore, we find this opinion to be inaccurate and further, we request you rescind said letter or provide an explanation to both parties that remove any doubt as to the facts, as they clear and of record.

*Id.* No response to the letter is contained within the stipulated facts.

On August 8, 2007, Chesapeake filed the instant action against Valence seeking a declaratory judgment that either (1) "the lands covered by the [Chesapeake Lease] are not subject to any oil and gas lease or to the [1975 JOA], or alternatively (2) the 1975 JOA "and any oil and gas lease pursuant thereto be removed as a cloud on Chesapeake's title." Dkt. 1.

On August 29, 2007, Valence filed its answer. Dkt. 7. Valence also counterclaimed against Chesapeake seeking a declaratory judgment and relief based on the torts of tortious interference with contract, and slander of title. The declaratory judgment sought the following findings by the court

3

(1) A-440 was conveyed to Valence under the 1991 Assignment; (2) Chesapeake had actual or constructive knowledge of the 1991 Assignment, the 1975 JOA, and that Valence now owned A-440; (3) the Chesapeake Lease is a wrongful encumbrance and/or cloud on Valence's title to A-440, and that Valence's title to A-440 is superior and free from any rights claimed by Chesapeake; and (4) A-440 is subject to the 1975 JOA which remains in full force and effect as to A-440. Additionally, Valence filed a third-party complaint against CP seeking an identical declaratory judgment as detailed above.

All three parties filed motions for summary judgment. On August 1, 2008 the parties came before the court to argue their respective motions for summary judgment. After hearing argument relating to what interests CP conveyed to Valence, the court denied Valence's motion finding that the 1991 Assignment unambiguously assigned only CP's interest in the E. L. McCollum Gas Unit and not A-440. Dkt. 57.

## II.    REALIGNMENT OF PARTIES

The court's ruling on Valence's motion for summary judgment effectively forecloses any of Valence's claims against Chesapeake and CP. However, it also leaves Chesapeake asking for a declaratory judgment against no defendant—or more accurately, the wrong defendant. Chesapeake's complaint requests one of two declarations from the court:

> (1) "the lands covered by the [Chesapeake Lease] are not subject to any oil and gas lease or to the" 1975 JOA, or alternatively
>
> (2) the 1975 JOA "and any oil and gas lease pursuant thereto be removed as a cloud on Chesapeake's title."

Dkt. 1. Since the court has determined that the 1991 Assignment did not affect ownership of A-440, both of these declarations involve the relationship of the Chesapeake Lease to the 1975 JOA. The

proper defendant then would be CP, the party who owns the interest in the 1975 JOA that covers A-440 and who leased that interest to Chesapeake. Accordingly, the parties are REALIGNED. Chesapeake remains the plaintiff, but CP is now the defendant instead of the third-party defendant.

## III.   SUMMARY JUDGMENT

### A.   Standard of Review

Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *see also Christopher Vill., L.P. v. Retsinas*, 190 F.3d 310, 314 (5th Cir. 1999). The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment, there must be an absence of any genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48, 106 S. Ct. 2505 (1986). An issue is "material" if its resolution could affect the outcome of the action. *Daniels v. City of Arlington, Tex.*, 246 F.3d 500, 502 (5th Cir. 2001). "[A]nd a fact is genuinely in dispute only if a reasonable jury could return a verdict for the non-moving party." *Fordoche, Inc. v. Texaco, Inc.*, 463 F.3d 388, 392 (5th Cir. 2006).

When considering a motion for summary judgment, the Court must view the evidence in the light most favorable to the non-movant and draw all reasonable inferences in favor of the non-movant. *Adams v. Travelers Indem. Co. of Conn.*, 465 F.3d 156, 163-64 (5th Cir. 2006). The court must review all of the evidence in the record, but make no credibility determinations or weigh any evidence, disregard all evidence favorable to the moving party that the jury is not required to believe, and give credence to the evidence favoring the nonmoving party as well as to the evidence

supporting the moving party that is uncontradicted and unimpeached. *Jones v. Robinson Prop. Group, L.P.*, 427 F.3d 987, 993 (5th Cir. 2005). However, the nonmovant cannot avoid summary judgment simply by presenting "conclusory allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation." *See TIG Ins. Co. v. Sedgwick James of Wash.*, 276 F.3d 754, 759 (5th Cir. 2002); *see also Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir.1994) (en banc). By the same token, the moving party will not meet its burden of proof based on conclusory "bald assertions of ultimate facts." *Gossett v. Du-Ra-Kel Corp.*, 569 F.2d 869, 872 (5th Cir. 1978); *see also Galindo v. Precision Amer. Corp.*, 754 F.2d 1212, 1221 (5th Cir. 1985).

### B.     The Expiration or Tolling of the Chesapeake Lease

The Chesapeake Lease, as extended by the August 22, 2006 extension, had a primary term of 1 year "and as long thereafter as oil or gas is produced in paying quantities from the leased premises." Dkt. 33, Ex. 1. CP claims that Chesapeake has no standing to bring any of its claims in the instant case, because the Chesapeake Lease expired on its terms on October 1, 2007. Chesapeake counters that the expiration of the lease has been tolled based on the doctrine of repudiation.

Repudiation is an equitable doctrine akin to estoppel. *Exploracion De La Estrella Soloataria Incorporacion v. Birdwell*, 858 S.W.2d 549, 554 (Tex.App.–Eastland 1993, no writ). "The doctrine of repudiation [was] created by courts to prevent a lessor who wrongfully repudiates a lessee's lease from profiting from the wrong." *B. B. Energy L.P. v. Devon Energy Production Co., L.L.P.*, No. 3:07-CV-0723-O, 2008 WL 216583 at *11 (N.D.Tex. May 23, 2008) (citing *Kothmann v. Boley*, 158 Tex. 56, 60-61, 308 S.W.2d 1, 4 (1958)). "[R]epudiation of a lease by a lessor relieves the lessee from any obligation to conduct any operation on the land in order to maintain the lease in force

6

pending a judicial resolution of the controversy between the lessee and lessor over the validity of the lease." *Cheyenne Resources, Inc. v. Criswell*, 714 S.W.2d 103, 105 (Tex.App.–Eastland 1986, no writ). "However, in order to establish such a repudiation, the lessor must have asserted a clear, unequivocal challenge to the lessee's title to, and interest in the lease." *Atkinson Gas Co. v. Albrecht*, 878 S.W.2d 236, 239 (Tex.App.–Corpus Christi 1994, writ denied); *see also Mitchell Energy Corp. v. Samson Res. Co.*, 80 F.3d 976, 982 (5th Cir. 1996) (citing *Exploracion*, 858 S.W.2d at 554).

A review of Texas law shows that in order to find repudiation the court must find three things. First, the lease must be in effect at the time of repudiation—in other words not expired. *Exploracion*, 858 S.W.2d at 555 (demand letter written by lessor to lessee whose lease had already expired not repudiation). Second, the repudiation must affect the *title* to the lease and not other interests. *Atkinson*, 878 S.W.2d at 239 (lessee who shut-in well and sent note to lessor saying "No-pay, no gas!" did not repudiate because the note referenced royalty rights, not title); *City of Brady v. Bennie*, 735 S.W.2d 275, 284-85 (Tex.App.–Eastland 1987, no writ) (lawsuit between lessor and lessee regarding a farmout agreement did not address the title to and rights in a lease, and therefore did not constitute repudiation). And last, the repudiation must contain a "positive challenge to [lessor's] title to the lease." *Adams v. Cannan et al.*, 253 S.W.2d 948, 951 (Tex.Civ.App.–San Antonio 1952, no writ). Here, the Chesapeake Lease was still valid under its primary term when the alleged repudiation occurred, and the challenge is clearly to the title of A-440. So, the only issue remaining is whether CP issued a positive challenge to title sufficient to find that it repudiated the lease.

As with most equitable doctrines, whether the lessor made "a clear, unequivocal challenge" sufficient to repudiate the lease is a question of fact. If the court finds that the lease has been

repudiated, then it should place "the parties back in their original position [before the repudiation and give] the lessee an opportunity to perform the conditions necessary to maintain the lease"—effectively tolling the expiration of the lease. *B.B. Energy*, 2008 WL 2164583 at *12.

Chesapeake argues that CP's May 4, 2007 letter to Valence and copying Chesapeake was a clear, unequivocal challenge to its title to and interest in the lease. The letter reads in relevant part

> We have reviewed our files and concluded that the aforementioned Oil and Gas Lease granted to Chesapeake would be effective only as to those rights/depths within the Stayton Survey A-440 that were not assigned to Valence Operating Company by Conoco, Inc. by [the 1991 Assignment].
>
> Therefore the Chesapeake lease would be effective as to rights from surface down to the stratigrahic equivalent of the base of the Upper Wilcox "E" sand as defined at an electric log depth of 8915 feet . . . .

Dkt. 33, Ex. 7. Chesapeake's reply letter was immediate and emphatic. Chesapeake informed CP that the Chesapeake lease contained no mineral or depth reservation. Additionally, it wrote that "[a]fter a review of [the 1991 Assignment], we find no evidence that Conoco conveyed any interest outside the E. L. McCollum Gas Unit . . . which *does not* include any acreage in the adjacent R.W. Stayton Survey, A-440." *Id.* at Ex. 8.

Chesapeake points to the case of *Humphrey v. Seale* for the proposition that a lessee is relieved from an operations clause if the lessor repudiates the lease. 716 S.W.2d 620, 623 (Tex.App.–Corpus Christi 1986, no writ).

CP counters that its letter to Valence copying Chesapeake was merely an opinion, not an unequivocal statement. It further argues that Chesapeake itself admitted this fact in its reply letter when it stated

> The facts are there is no documentation we have found to substantiate your *opinion* in said letter to Valence dated May 4, 2007. Therefore we find this *opinion* to be

>inaccurate and further, we request you rescind said letter or provide an explanation to both parties that remove any doubt as to the facts, as they are clear and of record.

Dkt. 33, Ex. 7 (emphasis added). According to CP, Texas law clearly holds that expressing an opinion is not the same as an unequivocal challenge. CP cites *Adams v. Cannan et al.* in support of its argument. 253 S.W.2d 948 (Tex.Civ.App.–San Antonio 1952, writ ref'd). And at first blush, *Adams* does seem to be directly on point. However on more careful analysis, the parallels weaken significantly. In *Adams*, the trial court found repudiation based on the following letter to the lessor.

>We have had some previous correspondence about [the disputed lease]. It is [the lessee's] understanding that the lease has been assigned to you and that no oil has been run to the pipeline from the well drilled on the land since the latter part of March, 1950, and that no oil has been produced from the land since the latter part of the same month. It is [the lessee's] information also that there has been no drilling or reworking operations on the land since the production ceased.
>
>Under the circumstances, and since the primary term of one year has expired, it would seem that the lease has terminated for failure to produce oil and gas, or either of them.
>
>[The lessee] has asked that we prepare and send to you a release of the lease and you will find it enclosed. [The lessee] requested that we ask you to execute the release and return it to us for delivery to him.

*Id.* at 950-51. The appellate court disagreed with the trial court. It found that the letter did "not purport to be a firm declaration of a position or contention that [the lessee] held title to the premises involved to the exclusion of all rights of the" lessor. *Id.* at 951. The court stated that the phrasing of the letter suggested that *if* the lessee's understanding of the facts recited was correct, then the lease had expired. *Id.* But, the court found that the lessee had left open the opportunity for an explanation showing the vitality of the well was a possibility. *Id.* at 951-52.

Notably, the court contrasted *Adams* with another case involving a letter. In *Shell Oil Co. v. Goodroe*, the lessees sent what the *Adams* court held up as paradigmatic notice constituting the

basis for repudiation. 197 S.W.2d 395 (Tex.Civ.App.–Texarkana 1946, writ ref'd n.r.e.). In *Goodroe*, the lessees sent the following letter to the lessors.

> I represent the royalty owners in the land referred to in the caption and upon investigation have concluded that the oil and gas lease formerly held by you, covering said land, has terminated under its own provisions.
>
> Therefore, this is to demand that you execute and forward to me a proper release of said oil and gas lease.

*Id.* at 399. The language in *Goodroe* more closely parallels CP's language in its letter. CP stated that it had concluded that the Chesapeake lease "would be effective only as to those rights/depths in [A-440] not assigned to Valence." Clearly, CP is informing Chesapeake that it has no rights below 8,915 feet. There is no possibility here that Chesapeake can somehow demonstrate that its performance has maintained the vitality of the lease, because the letter in essence states that the Chesapeake Lease was *never* effective for depths below 8,915 feet.

CP argues that the court should not find repudiation, because Chesapeake's actions subsequent to CP's letter do not comport with its repudiation argument. Essentially, CP is arguing that Chesapeake waived its right to use the repudiation defense when it acted in a manner inconsistent with repudiation. CP points to the fact that after it had already exchanged letters regarding Valence's alleged interest in A-440, Chesapeake wrote to CP requesting to extend the lease and admitting that the lease would expire on October 1, 2007. Dkt. 33, Ex. 9. Additionally, Chesapeake applied for and obtained drilling permits for A-440 for depths below 8,915 feet. Dkt. 33, Exs. 10-12. However, the court has not located any Texas law stating that a party claiming repudiation of a lease with an operations clauses waives the repudiation defense by continuing operations. To the contrary, the statements of law regarding repudiation of an oil and gas lease speak

10

in terms of the relief of an obligation to perform, not a bar to further performance. *See e.g., Ridge Oil Co. v. Guinn Invs., Inc.*, 148 S.W.3d 143, 157 (Tex. 2004) (lessors who repudiate may not complain if lessee suspends operations); *Mitchell*, 80 F.3d at 982 (repudiation "relieves the lessee from any obligation to conduct operations"); *Atkinson*, 878 S.W.2d at 239 ("[R]epudiation by a lessor relieves the lessee from any obligation to conduct any operation on the land in order to maintain the lease."); *Cheyenne*, 714 S.W.2d at 105 (same); *Kothmann*, 308 S.W.2d at 4 (lessors who repudiate "cannot complain if [the lessees] suspend operations under the contract pending a determination"). Furthermore, it seems rather a paradox to find that a lessee can lose his right to perform more operations under the lease by performing operations under the lease. Therefore, the fact that Chesapeake wanted to renew the lease and applied for drilling permits does not affect its ability to bring the repudiation defense. Accordingly, the court finds that CP repudiated the lease.

The remedy for repudiation is to allow the lessee "a reasonable time after termination of the litigation in which to perform conditions required to extend the lease." *NRG Exploration, Inc. v. Rauch*, 671 S.W.2d 649, 652 (Tex.App.–Austin 1984, writ ref'd n.r.e.). In the instant case, CP repudiated the Chesapeake Lease on May 4, 2007. Dkt. 33. Ex. 7. The primary term of the Chesapeake Lease would have ended on October 1, 2007 absent production of oil and gas in paying quantities. Therefore, had CP not repudiated the lease, Chesapeake would have had approximately 6 months either to produce in sufficient paying quantities, or to negotiate an extension of the lease. Accordingly, the Chesapeake Lease shall remain in full force and effect for a primary term of 6 months to commence when judgment becomes final, and as long thereafter as oil, gas and all other minerals are produced from the land thereunder. *Accord Tar Heel Energy Corp. v. Menking*, 621 S.W.2d 450, 451 (Tex.App.–Corpus Christi 1981, no writ).

### C.      Superiority of Title; the 1975 JOA vs. the Chesapeake Lease

Having determined that the Chesapeake Lease was repudiated and therefore the expiration of the lease is tolled, the court must now to turn to the validity of Chesapeake's title to A-440 at depths below 8,915 feet vis-a-vis the 1975 JOA. The 1975 JOA's term clause reads

> This agreement shall remain in full force and effect for as long as *any* of the oil and gas leases subjected to this agreement remain or are continued in force as to any part of the Unit Are, whether by production, extension, renewal or otherwise.

Dkt. 33, Ex. 4 (emphasis added). Additionally, the 1975 JOA provided that

> If any party owns an unleased oil and gas interest in the Unit Area, that interest shall be treated for the purpose of this agreement as if it were a leased interest under the form of oil and gas lease attached as "Exhibit B" and for the primary term stated therein.

*Id.* And, the primary term for the oil and gas lease attached as Exhibit B was for "a term concurrent with the term of the Operating Agreement to which this Exhibit 'B' is annexed." *Id.* No party has argued that the 1975 JOA has expired on its terms, so presumably it is still valid as to all the properties it covers. Exhibit A to the 1975 JOA is a plat showing acreage in Victoria County, Texas. *Id.* Although every copy of Exhibit A given to the court is partially illegible, it appears that A-440 is subject to the 1975 JOA—and the parties do not really dispute this.[2] So, Chesapeake must demonstrate why it should take the lease to A-440 below 8,915 feet free from CP's facially superior title.

Chesapeake argues that it is a bona fide purchaser without notice—actual or constructive—of the 1975 JOA, and therefore, it should have title free and clear. TEX. PROP. CODE § 13.001(a) ("A

---

[2] In its motion, Chesapeake drops a footnote to the effect that the attached plat is likely an insufficient description of lands to be enforceable under the statute of frauds. Dkt. 36 at 5 n.1. However, for the purposes of the motion only, Chesapeake agrees that A-440 falls within the 1975 JOA.

conveyance of real property or an interest in real property or a mortgage or deed of trust is void as to a creditor or to a subsequent purchaser for a valuable consideration without notice unless the instrument has been acknowledged, sworn to, or proved and filed for record as required by law."). CP counters that Chesapeake cannot use the bona fide purchaser argument, because it took title via quitclaim, and a quitclaim comes without warranty of title. *Smith v. Morris & Co.*, 694 S.W.2d 37, 39 (Tex.App.–Corpus Christi 1985, writ ref'd n.r.e.) ("A grantee in a quitclaim deed is not an innocent purchaser without notice but takes with notice of all defects in his grantor's title."). Additionally, CP argues that even if the deed is not a quitclaim deed, Chesapeake had constructive notice of the 1975 JOA. Chesapeake replies that although the lease contained language that was an exclusion of a warranty of title, under Texas law that does not translate to a quitclaim deed. It also disputes that it had knowledge of the 1975, constructive or otherwise.

### 1.     Quitclaim Deeds and the Chesapeake Lease

"A warranty deed to land conveys property; a quitclaim deed conveys the grantor's rights in that property, if any." *Geodyne Energy Income Prod. P'ship I-E v. Newton Corp.*, 161 S.W.3d 482, 486 (Tex. 2005); *Rogers v. Ricane Enters., Inc.*, 884 S.W.2d 763, 769 (Tex. 1994). "In deciding whether an instrument is a quitclaim deed, courts look to whether the language of the instrument, taken as a whole, conveyed property itself or merely the grantor's rights." *Geodyne*, 161 S.W.3d at 486. "Whether an instrument is a quitclaim or not depends upon the intent of the parties to it as that intent appears from the language of the instrument itself." *Winnigham v. Dyo*, 48 S.W.2d 600, 603 (Tex. 1932). In other words, the key to the inquiry is: what did the lessor *intend to convey*.

The two clauses in the Chesapeake Lease that play a role in this analysis are the habendum clause and the warranty clause. The habendum clause reads in full:

> Lessor, in consideration of Ten Dollars ($10.00) and the additional consideration hereinafter mentioned, of royalties herein provided and of the agreements of Lessee herein contained hereby grants, leases and lets exclusively unto Lessee for the purpose of exploring, prospecting, drilling and operating for and producing oil, gas and casinghead gas in and on that lands in the State of Victoria County of Texas, said lands being sometimes hereinafter referred to as the "leased premises".

Dkt. 33, Ex. 1. The "leased premises" are described on Exhibit A and described in their entirety as:

> 1680.0000 more or less being described as the acres Section 10 Indianola RR Co Survey A-440; Section 22 Indianola RR Co Survey A-443; E/2 Section 20 Indianola RR Co Survey A-433; NW/80 Section 24 Indianola RR Co Survey A-391, Victoria County, Texas.

*Id.* Towards the end of the lease, the warranty clause reads in full:

> This lease is given without warranty of title, either express or implied. If by the execution of this lease there is subjected thereto less than the entire undivided fee simple estate in the oil, gas and casinghead gas in and under the above described lands, then the royalties provided in Paragraph 3 above shall be payable only in the proportion thereof that the interest in the oil, gas and casinghead gas subject to this lease bears to the entire fee simple estate in the oil, gas and casinghead gas in and under the leased premises.

*Id.* (emphasis added).

CP argues that the warranty clause expressly converts this deed into a quitclaim deed, because it conveys the land without any warranties. Chesapeake, however, focuses its attention on the habendum clause and argues that the conveyance is for the lands, not CP's rights to the lands. Moreover, Chesapeake argues that an exclusion of warranty cannot, by itself, convert a deed in fee simple to a quitclaim deed. Texas law agrees.

A "warranty is a separate covenant from the grant. It is not part of the conveyance. . . It is a contract on the part of the grantor to pay damages in the event of failure of title." *Bass v. Harper*, 441 S.W.2d 825, 827 (Tex. 1969). A Texas appellate court has recently examined whether a deed was a quitclaim in a case where an express exclusion of warranty was part of the deed. *Choice*

14

*Acquisitions No. Two, Inc. v. Noesi*, No. 14-06-00973-CV, 2007 WL 2239206 (Tex.App.–Houston [14th Dist.] 2007, no pet.). The deed, in a section entitled "Reservations from and Exceptions to Conveyance and Warranty," contained the following language in all caps: "Grantee is purchasing the property 'as is,' 'where is[,]' and with 'all faults' and specifically and expressly without any warranties, representations[,] or guaranties, of any kind, oral or written, express, implied[,] or statutory, concerning the property from or on behalf of the Grantor." *Id.* at *5. Viewing the deed as a whole, the court found that it was not a quitclaim deed, because the same section also included language that said that the Grantor "grants, sells, and conveys to Grantee the property . . . to have and to hold it to Grantee, [and] Grantee's heirs." *Id.* Clearly, the court found that the conveyance language took precedence over the warranty language. Notably, in this case, unlike the instant case, the exclusion of warranty was in a section entitled "Exceptions to Conveyance," and in the same section with the conveyance language. *Id.* Here the warranty language and the conveyance language are separated by several pages.

Distinguishing the warranty language from the conveyance language may seem like a distinction without a difference. After all, if the grantor grants lands, but will not warranty that he has title to those lands, is that not the same thing as conveying only the interest he has in the land, if any? The simple answer is no, they are not the same. A warranty is a remedy—a promise to pay or indemnify if something goes wrong. *City of Beaumont v. Moore*, 146 Tex. 46, 202 S.W.2d 448, 453 (1947) (warranty is a covenant for "indemnity of the purchaser against loss or injury he may sustain due to a failure or defect of title"). Because the Chesapeake Lease contains the warranty clause, Chesapeake could not bring a claim against CP for breach of contract or breach of warranty. But, whether Chesapeake can sue CP for indemnity is a completely different from whether CP

15

conveyed the entire fee to Chesapeake. The conveyance affects the rights of the grantee. The warranty affects the remedies available against the grantor. This distinction explains why Texas courts have consistently held that the warranty and the conveyance are separate covenants.

Here, the habendum clause purports to grant, lease and let the land. Dkt. 33, Ex. 1. This clause conveys the entire fee simple. Contrast the Chesapeake Lease's language with the deed language in a recent Texas Supreme Court case. That deed conveyed "*all of [grantor's] right, title, and interest*" in the described lease "as is and without warranty of merchatibility . . . [and] without warranty of title either express or implied." *Geodyne*, 161 S.W.3d at 486 (emphasis added). The court agreed with the grantor and found without any reference to the exclusion of warranty that the deed conveyed only the grantor's interest, if any, in the property.

Additionally, here the warranty clause itself contains language contradicting any intent to convey a lessor deed. It states that if the lease conveyed less than "the entire fee simple" estate in the mineral rights, the royalties would be prorated to reflect only the proper portion of "the entire fee simple estate." Dkt. 33, Ex. 1. This language would suggest that it was CP's intent to convey the entire fee simple, and the proration language protected it should it have failed to do so. The Fifth Circuit construing Texas law has said that "what is important and controlling is not whether the grantor actually owned the title to the land it conveyed, but whether, in the deed, it asserted that it did, and undertook to convey it." *Am. Republics Corp. v. Houston Oil Co.,* 173 F.2d 728, 734 (5th Cir. 1949). Therefore, the court finds that the Chesapeake Lease is not a quitclaim deed. CP has made no other arguments that Chesapeake did not enter into the lease in good faith or that it did not give value for the lease, therefore the only inquiry left is whether Chesapeake had constructive or actual notice of the 1975 JOA.

### 2.     Constructive or Actual Notice of the 1975 JOA

CP makes two arguments as to why Chesapeake had constructive notice of the 1975 JOA. First, CP repeats its quitclaim argument, stating that because the deed was a quitclaim deed, Chesapeake had constructive notice as a matter of law. But, as detailed above, the court finds that the Chesapeake Lease was not a quitclaim. Therefore that argument fails. Second, CP argues that since Chesapeake has made statements in its pleadings to the effect that A-440 was subject to the 1975 JOA, that current knowledge somehow imputes knowledge to Chesapeake at the time the lease was executed. CP elaborates that if Chesapeake now admits to the existence of a prior existing and valid interest—the 1975 JOA—Chesapeake cannot now argue that the 1975 JOA was not in its chain of title. However, CP entirely ignores the temporal aspect of the knowledge element. *Rider v. Radford*, 151 S.W. 1181, 1181 (Tex. 1912) ("The rights of the parties are to be measured by the facts as they existed at the time of the conveyance."); *McKamey v. Thorp*, 61 Tex. 648, 654 (1884). Accordingly, this argument fails as well.

In its motion for summary judgment, Valence[3] argued that Chesapeake had constructive notice of the 1975 JOA because the JOA was mentioned in the 1991 Assignment which was properly recorded. Valence would like to frame the question before the court as whether the 1991 Assignment would have placed on Chesapeake a duty to conduct a complete inquiry of the properties covered by the 1975 JOA. *See Westland Oil Development Corp. v. Gulf Oil Corp.*, 637 S.W.2d 903 (Tex. 1982). However, the 1991 Assignment is not the logical starting point. "A party is not charged with constructive notice of a recorded instrument which is not within his chain of title." *SW*

---

[3] The court has already denied Valence's motion for summary judgment. Dkt. 57. However, since both Valence and CP have argued constructive knowledge of the 1975 JOA, and their arguments are similar, the court will address all of the constructive knowledge arguments.

*Title Ins. Co. v. Woods*, 449 S.W.2d 773, 774 (Tex. 1970). To properly understand Chesapeake's required level of knowledge, the court must start where Chesapeake started—with A-440. The question before the court really should be whether in tracing A-440's chain of title from the sovereign until its conveyance to Chesapeake, any recorded document would have given rise to the duty mentioned above. If nothing in the chain would have triggered the duty to fully investigate, then constructive knowledge may not be imputed to Chesapeake. *Id.*

"Chain of title refers to the documents which show the successive ownership history of the land. The chain of title is 'the successive conveyances, commencing with the patent from the government, each being a perfect conveyance of the title down to and including the conveyance to the present holder.'" *Munawar v. Cadle Co.*, 2 S.W. 3d 12, 20 (Tex.App.–Corpus Christi 1999, pet denied) (citing *Reserve Petroleum Co. v. Hutcheson*, 254 S.W.2d 802, 806 (Tex.Civ.App.–Amarillo 1952, writ ref'd n.r.e.)). Chesapeake has offered unrefuted summary judgment testimony in the form of the affidavit of an attorney specializing in oil and gas law and land title examination stating that the 1975 JOA is nowhere in Chesapeake's chain of title, nor is there any reference that would have led to the discovery of the 1975 JOA. Dkt. 36, Ex. 8. Valence argues that Chesapeake had a duty to search the entire grantor index for Victoria County for all entries regarding ConocoPhillips. Valence offers no law for this proposition. And, clearly such a duty would be onerous indeed. Not only would Chesapeake have had to search the entire grantor index for Victoria County back to the beginning of time—or at least to the sovereign, but it also would have had to search for all predecessors-in-interest for ConocoPhillips as well. Absent some authority imposing this duty, the court finds that Chesapeake was not on constructive notice of a document not in its chain of title.

Therefore, the court finds that Chesapeake is a bona fide purchaser for value without notice and takes title to the Chesapeake Lease free of the 1975 JOA.

## CONCLUSION

Pending before the court are Chesapeake and CP motions for summary judgment. Dkts. 36, 43. For reasons above, Chesapeake's motion is GRANTED, and CP's motion is DENIED. The court finds that the property at issue, Section 10, Indianola R.R. Co. Survey A-440, covered in the Chesapeake Lease are not subject to the 1975 JOA. Furthermore, it is ORDERED that the Chesapeake Lease shall remain in full force and effect for a primary term of 6 months to commence when the judgment becomes final, and as long thereafter as oil, gas and all other minerals are produced from the land thereunder.

It is so ORDERED.

Signed at Houston, Texas on September 10, 2008.

_____
Gray H. Miller
United States District Judge

TO ENSURE PROPER NOTICE, EACH PARTY RECEIVING THIS ORDER SHALL
FORWARD IT TO EVERY OTHER PARTY AND AFFECTED NONPARTY